ARMAND ZILDJIAN *vs.* APARECIDA ZILDJIAN.

Plymouth. January 16, 1979. — June 29, 1979.

Present: HALE, C.J., GOODMAN, & BROWN, JJ.

*Divorce*, Condonation, Recrimination, Alimony, Counsel fees. *Evidence*, Relevancy and materiality, Cross-examination.

Evidence in a divorce action was sufficient to warrant findings that each of four instances during the marriage when the defendant struck the plaintiff constituted cruel and abusive treatment. [4-5]

The judge in a divorce action did not err in finding that, in the circumstances, the plaintiff's conduct in continuing to have sexual relations with the defendant after incidents of cruel and abusive treatment by the defendant did not constitute condonation. [5-8]

Statute 1973, c. 740, abolishing the defense of recrimination in divorce actions, is applicable to any judgment entered after the effective date of the statute regardless of when the defense may have arisen. [8-12]

The provisions of G. L. c. 208, § 34, as appearing in St. 1974, c. 565, were applicable to a divorce proceeding in which the award of alimony was made after the effective date of the statute, even though trial of the case was in progress when the statute took effect. [12-14]

In a case in which alimony was awarded after the effective date of G. L. c. 208, § 34, as appearing in St. 1974, c. 565, the judge's apparent failure to consider all the factors enumerated in that statute, as indicated by the meager award to the wife, which the judge

termed as "in the nature of rehabilitative alimony," required that
the case be remanded. [14-17]

In a divorce action, the judge erred in admitting on the question of
alimony testimony elicited by the plaintiff from the defendant
about her relationship with a married man prior to her marriage to
the plaintiff. [17-18]

In a divorce action, the judge did not abuse his discretion in refusing
to allow the defendant to elicit testimony that prior to the mar-
riage the plaintiff had entertained women overnight in his house
and in an apartment which he rented. [18].

LIBEL for divorce filed in the Probate Court for the
county of Plymouth on October 27, 1972.

The case was heard by *Murphy*, J.

*John F. Driscoll (Daniel D. Gallagher* with him) for the
defendant.

*Monroe L. Inker (Donald Tye* with him) for the plaintiff.

GOODMAN, J. Aparecida Zildjian, the defendant in a
complaint for divorce in the Probate Court, appeals from
a judgment which granted her husband, Armand Zildji-
an, the plaintiff, a divorce for cruel and abusive treat-
ment and awarded her "the sum of fifteen thousand (15,-
000) dollars as alimony, said sum to be payable at the rate
of three thousand (3,000) dollars each year for five (5)
years." She contests both the judgment of divorce and the
sufficiency of the alimony.

The plaintiff filed a complaint for divorce on October
27, 1972; the defendant's answer denied the allegations of
cruel and abusive treatment and alleged as defenses con-
donation and recrimination. The trial of the case began
on March 19, 1974, and continued intermittently.[1] Both
parties rested on August 16, 1974, when the case was
continued for argument of counsel, which was heard on
December 6, 1974. Judgment was entered on October 1,
1975.[2] Thereafter, on April 19, 1977, the judge filed a

---

[1] Evidence was taken on March 19, March 20, March 28, April 17,
April 18, May 16, May 17, May 22, and August 16, 1974.

[2] The judgment bears the notation "nunc pro tunc as of December
6, 1974." Assuming, as the defendant contends, that this was improper

report of material facts to which, on the defendant's motion, he added two further findings. (The transcript of the testimony is before us.) We affirm the judgment insofar as it grants a divorce but remand the case for redetermination of the questions of alimony and counsel fees.

The following summary from the judge's findings will serve as a background to our discussion.[3] In October, 1965, the defendant came from Brazil to work in the plaintiff's home in Hingham. She had been recruited through an agency which furnished domestic help to people in the United States. The findings state that "[t]he plaintiff had been previously divorced and had custody of his three children, two daughters age 17 and 16 and a son age 13 . . . . The defendant lived in the home of the plaintiff and along with duties as a domestic, she cared for the plaintiff's children, planned and prepared the meals. The defendant took her meals with the plaintiff and his family and from time to time would join in with the family at some birthday anniversary celebrations and the like. Beyond this, the defendant had no social contact with the plaintiff." While employed by the plaintiff, the defendant trained at night to be a manicurist; and sometime late in

---

(see *Silverstein* v. *Silverstein*, 2 Mass. App. Ct. 94, 95, 97 n.4 [1974]), it is immaterial to so much of the judgment as grants a divorce, since we affirm that grant. On the defendant's contention, the judgment now takes effect as of April 1, 1976 (six months from October 1, 1975), pursuant to Mass.R.Dom.Rel.P. 62(g) (1975), and the nisi period will have run. The alimony provisions are being vacated for reconsideration, in any event.

[3] The standard of review, which we follow throughout this opinion, is set out in *Ober* v. *Ober*, 1 Mass. App. Ct. 32, 33 (1973), as adapted to Mass.R.Dom.Rel.P. 52(a) (1975): "We are to examine the evidence and decide the case according to our judgment, giving due weight to the findings of the probate judge which will not be reversed unless [clearly erroneous]. We are not limited to the facts recited in his report, but from the evidence can find facts not found by him. All questions of law, fact and discretion are open for our decision; and we can find facts contrary to his findings if convinced that he is [clearly wrong]."

1966, after her year's commitment was over, she left to take up that work.

Several months later, in the spring of 1967, the plaintiff telephoned her, and they began to see each other socially. They were married in December of 1967. At the time of their marriage, he was forty-six years old and she was thirty. It was her first marriage. The judge found that "[i]t was significant to note that after plans for their marriage were announced the attitude of the plaintiff's children changed towards the defendant which involved a course of conduct by them ranging from their not speaking to the defendant to an outright ignoring of the said defendant." The judge further found that from the beginning of the marriage, "a course of conduct between the parties was unfolding . . . involving plaintiff's children and the defendant, which . . . [resulted in] the ultimate deterioration of the marriage . . . ." The judge set out a series of some fourteen altercations and generally irritating incidents involving the plaintiff's family, friends and employees.

I. *The divorce.* The judge found four instances during the marriage when the defendant struck the plaintiff. These findings were supported by the plaintiff's testimony, which the judge could choose to believe rather than that of the defendant. *Wilde* v. *Wilde*, 350 Mass. 333, 334 (1966). *Mancuso* v. *Mancuso*, 1 Mass. App. Ct. 867, 868 (1974). It would serve no useful purpose to describe these incidents in detail at this point. (See note 6, *infra.*) We agree with the judge's finding that each of them, which he "treat[ed] . . . individually," constituted cruel and abusive treatment.[4] "H[er] violent acts were done in anger, not in sport." *Reddington* v. *Reddington*, 317 Mass. 760,

---

[4] The allowance of the plaintiff's additional specifications of cruel and abusive treatment was within the judge's discretion. There was no abuse. *Gardner* v. *Gardner*, 2 Gray 434, 439-440 (1854). *Shea* v. *Knowles Loom Works*, 305 Mass. 327, 328 (1940). See *Murray* v. *Murray*, 313 Mass. 8, 11 (1943). See also *Clifford* v. *Clifford*, 354 Mass. 545, 546-547 (1968).

766 (1945). See *Steere* v. *Steere*, 265 Mass. 317, 318 (1928); *Doyle* v. *Doyle*, 328 Mass. 174, 175 (1951).

A. *Condonation.* The defendant argues that the judge erred in rejecting the defense of condonation. She points out that the first two instances of cruel and abusive treatment found by the judge occurred in April, 1969, and June, 1970, and that despite those incidents the parties continued to live together as husband and wife. But we need not pause to decide whether in the circumstances there was a complete resumption of the marriage.[5] See *Holsworth* v. *Holsworth*, 252 Mass. 133, 134 (1925); *Sanderson* v. *Sanderson*, 271 Mass. 386, 389 (1930); *Eldridge* v. *Eldridge*, 278 Mass. 309, 311-313 (1932). See also *Steere* v. *Steere*, 265 Mass. at 318-319; *Callan* v. *Callan*, 280 Mass. 37, 43 (1932). The two subsequent and more violent incidents on March 15, 1971, and April 30 - May 1, 1971, are sufficient to sustain the divorce.[6]

The judge found that the rift in the marriage was definite and final on January 2, 1971, when the plaintiff ordered the defendant from the marital home, and she left to stay with her brother. On March 15, 1971, she returned on the advice of her attorney, letting herself in by breaking a pane of glass in the back door. The plaintiff again ordered her out, but she did not leave. The judge found that thereafter "the plaintiff and defendant occupied separate bedrooms and did not engaged in marital relations." The situation continued until the end of July,

---

[5] See *Littlefield* v. *Littlefield*, 292 A.2d 204, 211 (Me. 1972): "Condonation occurs when the injured spouse, with knowledge of the misconduct, undertakes expressly or impliedly to overlook and forgive the wrongs and restores the other spouse unconditionally (or conditionally if there is no recurrence of the bad conduct) to the enjoyment of all marital rights."

[6] The judge found that on March 15, 1971, "the defendant scratched the plaintiff on his left cheek and slapped his face several times as well." The judge also found that on April 30, 1971, and into May 1, 1971, "the defendant kicked the plaintiff on his legs and grabbed plaintiff's middle finger of his left hand and bent his finger backward causing the finger to swell . . . ."

when she was hospitalized at a private psychiatric hospital. Upon her release on September 19, 1971, she moved into her own apartment and has since lived apart from the plaintiff.

After she left on January 2, 1971, the parties discussed divorce and a financial settlement. The judge found that the plaintiff took the position with the defendant that "he *did not* want the defendant any longer and that the principal objection to her returning to the home was the defendant's inability to get along with his children . . . ." He further found that "in all of their discussions the plaintiff put his children before the defendant." "Condonation is a state of mind to be determined upon all the evidence, including rational inferences." *Hayden* v. *Hayden*, 326 Mass. 587, 591 (1950), citing *Drew* v. *Drew*, 250 Mass. 41, 45 (1924). It requires a factual determination of an intent to forgive; we can overturn the judge's refusal to make such a finding only if he was clearly wrong. *Giles* v. *Giles*, 279 Mass. 469, 471 (1932). *Doyle* v. *Doyle*, 328 Mass. at 176.

The defendant urges us to find condonation on the basis of her testimony that the parties engaged in sexual relations after the incidents of cruel and abusive treatment. She testified that they lived together as husband and wife in the marital home throughout the period from March 15, 1971, up to the time she was hospitalized. The judge, however, could, as he did, believe the plaintiff's testimony to the contrary. Further, it is apparent that — though the parties were living in the same house — the relationship had deteriorated to a "truce" with both parties represented by counsel. They were "not liv[ing] together as husband and wife in any real sense." *Hayden* v. *Hayden*, 326 Mass. at 591. See *Coan* v. *Coan*, 264 Mass. 291, 294-295 (1928); *Giles* v. *Giles*, 279 Mass. at 471; *Quigley* v. *Quigley*, 310 Mass. 415, 418 (1941). See also *Doyle* v. *Doyle*, 328 Mass. at 176.

The defendant also testified that after she was hospitalized on July 29, 1971, and thereafter during the remain-

Zildjian *v.* Zildjian.

der of the year 1971, and from time to time during 1972, she had sexual relations with the plaintiff at various hotels and motels. The judge pointed out in his findings that the defendant had put in evidence as exhibits twelve hotel and motel registration cards which "would give weight" to her testimony of sexual relations at the times and places indicated. We agree with the trial judge that even if her testimony, supported by the exhibits, is accepted, it does not require a finding of condonation. Sexual intercourse is not, as the defendant would have us hold, per se condonation. Even fifty years ago when sexual relations may have been viewed as more significant, the Supreme Judicial Court did not go beyond holding that sexual intercourse "ordinarily implies" condonement. *Coan* v. *Coan*, 264 Mass. at 295. See *Gardner* v. *Gardner*, 2 Gray 434, 442 (1854); *Drew* v. *Drew*, 250 Mass. at 45. *LaFlamme* v. *LaFlamme*, 210 Mass. 156, 158 (1911), is distinguishable; it is "not . . . a case of mere condonation . . . ." In the circumstances of this case, the judge was not clearly wrong in finding that the liaisons indicated by the exhibits, even if they did occur (the plaintiff denied them), did not manifest such a forgiveness — an intent to let bygones be bygones — as would rehabilitate the relationship and transform it into a significant marriage "in any real sense." *Hayden* v. *Hayden*, 326 Mass. at 591.

This case is similar in principle to *Littlefield* v. *Littlefield*, 292 A.2d 204, 211-212 (Me. 1972), in which the Supreme Judicial Court of Maine held that it was error to find condonation on the basis of sexual relations between the parties three or four times during one month, while the parties were living apart and proceedings for divorce were pending. The court said, "[T]he circumstances under which the sexual activity occurred are relevant to the legal significance of the acts. It would be unrealistic and unfair to hold as a matter of law that estranged spouses who engage in isolated acts of intercourse without resuming full cohabitation mutually intend condonation and a resumption of the full marriage relationship. While we

find that some courts hold that sexual intercourse is conclusive proof of condonation ... [citing cases], some of them reasoning that sexual activity *is* forgiveness ... [citing cases], we consider such holdings to be contrary to human experience ..." (emphasis in original). Thus, too, in *Chrisman* v. *Chrisman*, 156 Ind. App. 388, 393 (1973), the court refused to find condonation although the parties engaged in sexual relations during six weekends while divorce proceedings were pending and while the parties were living apart. See *Halverson* v. *Halverson*, 365 So.2d 600, 602 (La. App. 1978) ("isolated instances of sexual intercourse do not per se constitute reconciliation").

B. *Recrimination.* The defendant argues that the judge erred in failing to find cruel and abusive treatment by the plaintiff, which would sustain her defense of recrimination. However, that defense was foreclosed by St. 1973, c. 740, entitled "An Act providing that recrimination shall not be a defense to libel for divorce."[7] That statute was approved September 5, 1973, and thus became effective long before the judge entered judgment on October 1, 1975 (see note 2, *supra,* and text to which it is appended), and indeed before the trial of this case which began on March 19, 1974. By this statute (hereinafter the 1973 statute), the judge was precluded from "entertain-[ing]" or — to use a synonym — considering[8] the defense in deciding the case. It is thus at the point of judgment that the 1973 statute is expressly made applicable rather than at the point in 1972 when the defense may have arisen.

Our approach is suggested by the analysis in *Goodwin Bros. Leasing* v. *Nousis,* 373 Mass. 169, 173 (1977), in

---

[7] That act amends G. L. c. 208, § 1, and provides in part: "[A] divorce shall be decreed although both parties have cause, and no defense founded upon recrimination shall be entertained by the court."

[8] Webster's Third New Intl. Dictionary 757 (1971). *Ribaudo* v. *Citizens Natl. Bank,* 261 F.2d 929, 932 (5th Cir. 1958) ("[t]he key is that the Court must 'entertain' the petition, and this seems to be that it must consider it on its merits").

which the court found in the phrase "no action shall be
maintained" an intent that the statute apply to any ac-
tion in process without regard to the time when the basis
for the action arose. The manifestation of intent in the
statute satisfied the canon of interpretation in *Hanscom*
v. *Malden & Melrose Gas Light Co.*, 220 Mass. 1, 3 (1914):
"[A]ll statutes are prospective in their operation, unless
an intention that they shall be retrospective appears by
necessary implication from their words, context or ob-
jects when considered in the light of the subject matter,
the pre-existing state of the law and the effect upon exist-
ent rights, remedies and obligations." For a like approach
giving retrospective effect to statutes changing grounds
for divorce see *Schuster* v. *Schuster*, 42 Ariz. 190, 199
(1933), and *Long* v. *Long*, 135 Minn. 259, 260-261 (1916).

The intent of the 1973 statute, to speak as of the time
of the judgment, is also supported by the correlative
provision of the statute in the first clause. Here, too, if we
"look to the stage of the proceedings affected by the
change" (*Porter* v. *Clerk of the Superior Court*, 368 Mass.
116, 118 [1975]), it appears that it is the "decree [   ]"[9] that
the clause specifically seeks to affect. This understanding
is reflected in *Gilmore* v. *Gilmore*, 369 Mass. 598, 599
(1976), in which divorces were granted to both parties on
March 7, 1974, after the effective date of the statute, for
a cause (cruel and abusive treatment) which arose before
the statute became effective. The wife's libel in that case
was filed on April 18, 1973, and the husband's cross libel
was filed on December 5, 1973. Read as a whole, the 1973
statute has, in effect, substituted a cross action for a de-
fense in a divorce proceeding. So viewed, the statute may
be categorized as remedial — a change in remedy for the
same wrong committed against the defendant — and
therefore to be applied retrospectively. See *City Council*

---

[9] Statute 1975, c. 400, § 6, amending G. L. c. 208, § 1, changed "de-
creed" to "adjudged" in conformity with the Massachusetts Rules of
Domestic Relations Procedure.

*of Waltham* v. *Vinciullo*, 364 Mass. 624, 626 (1974); *Goodwin Bros. Leasing* v. *Nousis*, 373 Mass. at 173.

The change made by the 1973 statute is suggestive of the statutory change made by St. 1838, c. 126, permitting a final divorce (a vinculo) for desertion which theretofore had been a cause only for judicial separation (a mensa et thoro). In *Stevens* v. *Stevens*, 1 Met. 279, 279-280 (1840), the court held that a libel for a final divorce could be brought after that statute was enacted, though the requisite period of desertion had occurred before it was passed and a libel had already been brought under the old statute.[10] See *Bigelow* v. *Bigelow*, 108 Mass. 38, 39-40 (1871); *Wales* v. *Wales*, 119 Mass. 89, 90-91 (1875). Compare *West* v. *West*, 2 Mass. 223, 226 (1806). In the light of these cases, we do not believe that a different result is impelled by the dictum in *Burt* v. *Burt*, 168 Mass. 204, 207 (1897) (referred to in *Hanscom* v. *Malden & Melrose Gas Light Co.*, 220 Mass. at 5), that "[d]ivorce statutes generally have been held not to be retrospective."

It is instructive that the New York Divorce Reform Law (1966 N.Y. Laws, c. 254) — reminiscent of the early Massachusetts statutes permitting the transformation of a judicial separation into a final divorce — also provides for a final divorce predicated on a judgment of separation under which the parties have lived apart for a specified period. N.Y.Dom.Rel.Law § 170(5) (McKinney 1977). The Court of Appeals in *Gleason* v. *Gleason*, 26 N.Y.2d 28, 36 (1970), held that provision to be retrospective and applicable to judicial separations which occurred before the act. Chief Judge Fuld pointed out, among the considerations in favor of a retrospective interpretation, that otherwise

---

[10] This case is cited in *Sparhawk* v. *Sparhawk*, 116 Mass. 315, 318 (1874), for the rule that: "The Legislature undoubtedly has the power by general laws to specify the grounds and regulate the forms of divorce in future cases; and even to authorize this court to entertain applications for an absolute divorce for causes already occurred, and which at the time of their occurrence were grounds for a divorce from bed and board only." See *Maynard* v. *Hill*, 125 U.S. 190, 210-211 (1888).

"the legislative purpose of effectively reforming the
State's divorce law would, to a large extent, be defeated
. . . ." *Gleason* v. *Gleason*, 26 N.Y.2d at 38.

This also has application to the abolition of the defense
of recrimination which has been widely criticized and of
which it has been said: "Recrimination is the outrageous
legal principle which ordains that when both spouses
have grounds for divorce, neither may have a decree."
Clark, Domestic Relations § 12.12, at 373 & n.1 (1968).
*DeBurgh* v. *DeBurgh*, 39 Cal. 2d 858, 870 (1952) (Traynor,
J.) ("Few rules of law have been more widely condemned
by the legal profession"). *Burns* v. *Burns*, 145 Mont. 1, 4
(1965) (recognizing "the socially stultifying effects of the
doctrine"). Indeed, the 1973 statute signals the beginning
of a movement in the Massachusetts Legislature to re-
form the divorce laws.[11] See *Tipping* v. *Tipping*, 82 F.2d
828, 831 (D.C. Cir. 1936); *Dodrer* v. *Dodrer*, 183 Md. 413,
417 (1944).

Chief Judge Fuld also observes that: "It is worthy of
note that the overwhelming weight of authority supports
retroactive application of legislative creation or amend-
ment of divorce grounds, unless the statutory language
employed precludes such a construction," citing a num-
ber of cases and Annot., 23 A.L.R.3d 626, 630-632 (1969).
*Gleason* v. *Gleason*, 26 N.Y.2d at 36 n.5. See *Chalmers* v.
*Chalmers*, 65 N.J. 186, 190-191 (1974) (abolition of condo-
nation defense held retrospective); *Hopkins* v. *Hopkins*,
540 S.W.2d 783, 786 (Tex. Civ. App. 1976) (abolition of
recrimination defense held retrospective); *Wenderlich* v.

---

[11] In 1973, bills were introduced to reduce the necessary period of
desertion as a ground for divorce from two consecutive years to one
year (S. 566, H. 2941, H. 3683, H. 3686), to dispose of marital property
at the time of divorce (S. 569, S. 731), and to provide for various forms
of no-fault divorce (S. 566, H. 1367, H. 2311, H. 2941, H. 3683, H. 3686,
H. 6161). Reform statutes were subsequently passed in 1974 (one-year
desertion — St. 1974, c. 358, § 1; alimony and property division —
St. 1974, c. 565) and in 1975 (divorce for irretrievable breakdown —
St. 1975, c. 698, § 2).

*Wenderlich*, 34 App. Div. 2d 726, 726-727 (N.Y. 1970) (addition of cruel and inhuman treatment as a cause for divorce held retrospective); *Long* v. *Long*, 135 Minn. at 260-261 (addition of commitment in a State prison or reformatory outside Minnesota as a ground for divorce held retrospective); *Dodrer* v. *Dodrer*, 183 Md. at 417 (addition of insanity as ground for divorce held retrospective). 1 Bishop, Marriage, Divorce and Separation § 1480 (1891).[12]

II. *Alimony and counsel fees.* Our analysis of the 1973 recrimination statute also applies to G. L. c. 208, § 34, as appearing in St. 1974, c. 565 (hereinafter referred to as the new alimony statute).[13] Here, analogously, c. 565 purported to affect the "order ... to pay alimony," which may be entered "[u]pon a *divorce or upon* petition at any time after a divorce." It was obviously remedial and when made "upon a divorce" was concerned with the adjust-

---

[12] A number of cases quote the following from that section of the treatise: "If, contemplating the interest involved as public, it is for the public order and profit that marriage be dissoluble after the transpiring of a particular delictum, it can make no difference what was the date of the delinquency, or whether before or after the statute was enacted. Hence, when the legislative intent does not directly appear in the statutory words, they should be applied equally to past and future transactions."

[13] General Laws c. 208, § 34, was further revised by St. 1975, c. 400, § 33, and St. 1977, c. 467, so that it now provides: "Upon divorce or upon motion in an action brought at any time after a divorce, the court may make a judgment for either of the parties to pay alimony to the other. In addition to or in lieu of a judgment to pay alimony, the court may assign to either husband or wife all or any part of the estate of the other. In determining the amount of alimony, if any, to be paid, or in fixing the nature and value of the property, if any, to be so assigned, the court, after hearing the witnesses, if any, of each party, shall consider the length of the marriage, the conduct of the parties during the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court may also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates and the contribution of each of the parties as a homemaker to the family unit."

ment between the parties upon the dissolution of their marriage. As early as *West* v. *West*, 2 Mass. at 227, the court held retrospective a statute which provided that upon a divorce obtained by a wife for adultery, the wife could be awarded such personal estate as the husband had received by reason of the marriage. The court said, "We are also agreed that the additional act, passed March 7, 1806, applies to all cases of divorce decreed after the passing of it, whether the facts of adultery alleged and proved were committed before or after that date." *West* v. *West*, 2 Mass. at 226. Our understanding that the application of the new alimony statute depends on the date the alimony is ordered is reflected in *Milo* v. *Milo*, 3 Mass. App. Ct. 732, 732 (1975), and *Roberts* v. *Roberts*, 3 Mass. App. Ct. 789, 790 (1975), in which we remanded for reconsideration of alimony grants and indicated that the provisions of the new alimony statute, in effect on the date of the reconsideration, were to govern rather than the prior statute. See *Moran* v. *Moran*, 5 Mass. App. Ct. 787, 788 (1977).

We reject the plaintiff's contention that we should apply the new alimony statute only in cases in which it was in effect during the trial. Conditions on which the judgment is based are, to be sure, usually elicited at trial. But we have no doubt that when conditions change unexpectedly and radically immediately after trial (e.g., one of the parties should suddenly become disabled after trial but before judgment was entered), the proceedings would be reopened on motion. Here, too, if it could have been said that the standards of the new alimony statute were unknown and unanticipated so that the presentation by the parties was not properly focused, a party who felt aggrieved could have asked that the proceedings be reopened when he learned of the new standards. Here, however, the new standards were enacted on July 19, 1974, while the trial was in progress (note 1, *supra*; see *Attorney Gen.* v. *Prudential Ins. Co.*, 310 Mass. 762, 765 [1942]) and became effective before the final

hearing on December 6, 1974. Neither party has claimed
surprise, and indeed the plaintiff's proposed report of
material facts suggests that the judge grant alimony
"after considering all the factors enunciated in [G. L. c.]
208, § 34" — an obvious reference to the new alimony
statute. Further, both the plaintiff's presentation at the
hearing on December 6, 1974, and his memorandum of
law submitted to the judge, argue the new alimony stat-
ute.

Accordingly, it was error for the judge to rule that the
new alimony statute was not applicable; he was required
to consider all the factors listed in that statute. There-
fore, we must remand for such consideration unless in-
deed "the record indicate[s] clearly that the judge consid-
ered all the mandatory statutory factors." *Rice* v. *Rice*,
372 Mass. 398, 401 (1977), citing *Bianco* v. *Bianco*, 371
Mass. 420, 423 (1976). *King* v. *King*, 373 Mass. 37, 39-40
(1977). Quite apart from the judge's disavowal — implicit
in his ruling — of any intent to determine alimony in
terms of factors in the new alimony statute, the record
suggests that the meager award in this case may well
have resulted from a failure to consider the "station" of
the parties, which has been characterized as "the mode
and level of living, of each party during the marriage."
Inker, Walsh & Perocchi, Alimony and Assignment of
Property: The New Statutory Scheme in Massachusetts,
10 Suffolk U.L. Rev. 1, 19 (1975). *Rice* v. *Rice*, 372 Mass.
at 402. The report of material facts of April 19, 1977, on
which the alimony award was based, contains no mention
of the parties' station during their marriage; yet, from
additional findings of fact which the judge allowed on
May 24, 1977 (on the defendant's motion for additional
findings of fact filed May 2, 1977), it appears that: "Dur-
ing the marriage, the plaintiff took defendant to musical
shows, theatres and the like. He instructed her in art
appreciation. He maintained charge accounts so that she
could purchase clothes and accessories without limita-
tion. They frequently traveled abroad." They had lived in

a house in Hingham on three acres of land owned jointly by the plaintiff and his son and valued at $150,000. His yearly salary was $101,000, and in addition he received dividend distributions of $351,984 for 1972, and $538,426 for 1973 from his 40% interest in a family-owned business. The judge made no findings as to her income or assets, though at the time of trial it appears from the evidence that she was working as a manicurist at $120.00 per week. Compare *Nienow* v. *Nienow*, 268 S.C. 161, 172 (1977), in which the court concluded that "a lump sum of $15,000.00 is unreasonable in light of the wife's accustomed standard of living, the disparity between the parties' wealth, and their respective earning capacities." See also *O'Brien* v. *O'Brien*, 325 Mass. 573, 575-577 (1950).

The judge termed the alimony he granted as "in the nature of rehabilitative alimony"; and we are not sure of the significance of this characterization in the circumstances of this case.[14] There may be situations in which, a husband and wife of comparable professional and economic status having been divorced, it is fair and realistic, when all the statutory factors are considered, to give the spouse, who may on marriage have discontinued a career, sufficient funds merely to resume such an independent career. But see *Grinold* v. *Grinold*, 172 Conn. 192, 195 (1976). In the case before us, it is difficult to see how a consideration of all the factors, as required by the new alimony statute, could fairly result in an award which leaves the defendant, as far as the record indicates, at most only marginally independent. *Sisson* v. *Sisson*, 336 So.2d 1129, 1130-1131 (Fla. 1976). See *Hempel* v. *Hempel*,

---

[14] See Note, A Survey of Florida Alimony Since Passage of the 1971 Dissolution of Marriage Act, 28 U. Fla. L. Rev. 763, 774-776 (1976), discussing the varying approaches by the District Courts of Appeal in applying Fla. Stat. § 61.08(1) (1975), which provides: "[T]he court may grant alimony to either party, which alimony may be rehabilitative or permanent in nature." See also Note, Rehabilitative Spousal Support: In Need of a More Comprehensive Approach to Mitigating Dissolution Trauma, 12 U. S. F. L. Rev. 493 (1978).

225 Minn. 287, 292 (1948); *Ingram* v. *Ingram,* 217 Va. 27, 28-29 (1976).

The phrase "rehabilitative alimony" has a certain attraction, for it suggests an equality of economic opportunity between the sexes. But such an equality may be illusory in a concrete case, and under such circumstances an attempt to apply the notion may work an injustice. The caveat in *Sisson* v. *Sisson, supra,* is worth emphasizing. In that case the Supreme Court of Florida applied for the first time the Florida statute referred to in note 14, *supra,* in order to resolve conflicts among the District Courts of Appeal. A District Court of Appeal had reversed a lump sum grant of alimony on the ground that the wife was already trained as a physical therapist and required no rehabilitation. The Florida Supreme Court reinstated the award. It said: "Whether or not alimony is characterized as rehabilitative, the principal questions are the need of the spouse seeking alimony and the ability of the other spouse to pay . . . . With increasing opportunities for employment available to women, it may well be that wives today are generally less dependent financially on their husbands than their mothers were, and so less often in need of alimony if the marriage is dissolved. *But care must be taken to avoid confusing the general with the specific and mistaking the promise of the future for the realty of the present"* (emphasis supplied). *Sisson* v. *Sisson,* 336 So.2d at 1130-1131.[15] The court quoted (at 1131) from *Schultz* v. *Schultz,* 290 So. 2d 146, 147-148 (Fla. App. 1974): "We are not unmindful that Florida has gone to the no-fault divorce and that today's woman should be considered capable of earning a living equivalent to her male counterpart. Nevertheless, until the realities catch up with this laudable objective, we think that a divorced

---

[15] In 1978, Fla. Stat. § 61.08 was amended to add a number of specific factors, while retaining the former reference to rehabilitative alimony and a catchall provision for consideration of any factors "necessary to do equity and justice between the parties." 1978 Fla. Laws 78-339.

wife faced with an everyday concern about the where-withal to put bread on the table should not be penalized where her former spouse has the ability to help her provide it."

Since the grant of alimony requires reconsideration, it is appropriate that the judge reconsider the matter of counsel fees. See G. L. c. 208, § 38. These two matters should be considered together, for "a spouse's need for adequate legal representation in a lawsuit affecting the marital status is not materially different from those other needs . . . which fall within the more common meaning of alimony or support . . . . Although . . . particular considerations in measuring . . . [counsel fees] may differ from those applicable to alimony or support, the basic factors of need and relative economic positions of the spouses are relevant to all these matters." *Goldman* v. *Roderiques*, 370 Mass. 435, 437-438 (1976). See *Hano* v. *Hano*, 5 Mass. App. Ct. 639, 641-642 (1977); *Nienow* v. *Nienow*, 268 S.C. at 172 ("the burden of attorneys' fees would necessarily decrease her standard of living").

III. *Evidentiary matters.* A. We agree with the defendant that the judge improperly admitted testimony elicited by the plaintiff from the defendant on cross-examination about her relationship with a married man prior to her marriage to the plaintiff. The judge admitted this evidence on the question of alimony (it obviously had no relation to the cruel and abusive treatment alleged in this case), referring in his ruling to prior evidence of "a discussion concerning the amount of money it would take her to live, and . . . a discussion entered into in which she testified to concerning her values as far as marriage . . . ." Since we remand this case for reconsideration of the grant of alimony in any event, the testimony has become harmless. We point out, however, that its admission is inconsistent with the new alimony statute which provides that the judge "shall consider . . . the conduct of the parties *during the marriage*" (emphasis supplied). G. L. c. 208, § 34. "[H]is consideration of factors not enumerat-

ed in § 34 . . . constitute[d] an error of law." *Rice* v. *Rice,* 372 Mass. at 401.

B. There is no merit in the defendant's contention that the judge erred in refusing to allow the defendant on cross-examination to elicit that prior to the marriage the plaintiff had entertained women overnight in his house and in an apartment which he rented. It is difficult to see the relevance of this testimony to the physical acts of cruel and abusive treatment which formed the basis for the divorce. If there was discretion in the trial judge to admit this testimony (which we need not decide), it was certainly no abuse of discretion to limit the defendant's cross-examination to exclude this peripheral subject matter. *Campbell* v. *Ashler,* 320 Mass. 475, 481 (1946). *Commonwealth* v. *Greenberg,* 339 Mass. 557, 580-581 (1959).

IV. *Conclusion.*   Accordingly, so much of the judgment as relates to alimony is reversed, and the case is remanded for further proceedings, which may include taking further evidence, to redetermine alimony pursuant to G. L. c. 208, § 34, as most recently amended, and costs and expenses, including counsel fees in the Probate Court and on appeal — all in accordance with this opinion. The judgment of divorce is otherwise affirmed.

*So ordered.*