618 F.2d 1261
 5 Fed. R. Evid. Serv. 973
 UNITED STATES of America, Appellee,
v.
Harry S. HANSON, Jr., Appellant.
UNITED STATES of America, Appellee,
v.
Edward Dean COOK, Appellant.
UNITED STATES of America, Appellee,
v.
Roland Eugene ROY, Appellant.
UNITED STATES of America, Appellee,
v.
William Allen STATELY, a/k/a William Alan Stateler, Appellant.
UNITED STATES of America, Appellee,
v.
Thomas Peter BARRETT, a/k/a Thomas H. Barrett, Appellant.
 Nos. 79-1656 to 79-1660.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 17, 1980.
Decided April 1, 1980.
Rehearing and Rehearing En Banc Denied April 22, 1980.
 
 1
 Joseph S. Friedberg, Minneapolis, Minn., for appellant, Stately.
 
 
 2
 Thomas M. Kelly, Minneapolis, Minn., for appellant, Cook.
 
 
 3
 Scott F. Tilsen, Asst. Federal Public Defender, Minneapolis, Minn., for appellants, Hanson and Roy.
 
 
 4
 Neal J. Shapiro, Minneapolis, Minn., for appellant, Barrett.
 
 
 5
 Joseph S. Friedberg, Thomas M. Kelly, Scott F. Tilsen, Neal J. Shapiro, Minneapolis, Minn., and Donald J. Heffernan, St. Paul, Minn., on brief, for appellants.
 
 
 6
 Richard E. Vosepka, Asst. U. S. Atty., Minneapolis, Minn., for appellee; Thorwald H. Anderson, Jr., U. S. Atty., Richard E. Vosepka, Asst. U. S. Atty., Robin Sjaastad and Andrea White, Legal Interns, Minneapolis, Minn., on brief.
 
 
 7
 Before LAY, Chief Judge, STEPHENSON, Circuit Judge, and THOMAS,* Senior District Judge.
 
 
 8
 THOMAS, District Judge.
 
 
 9
 Defendants appeal from a five count indictment charging one count of conspiracy to assault federal officers (Title 18, United States Code, Section 372) and four counts of assault on federal officers (Title 18, United States Code, Section 111). A trial by jury was commenced on July 9, 1979, before the Honorable Edward J. Devitt, Chief Judge, United States District Court, District of Minnesota. Defendants were found guilty on all counts. We affirm the judgment of the District Court.
 
 
 10
 These cases arise out of a protest involving the takeover of the Red Lake Indian Reservation Law Enforcement Center during the morning of May 19, 1979.
 
 
 11
 Such action was the culmination of the defendants' dissatisfaction with tribal chairman Roger Jourdain, whom the defendants considered a "dictator". During the twenty-two year reign Jourdain had alienated many of the people on the reservation with his handling of things such as tribal elections, use of tribal funds, housing on the reservation and use of the tribal court system. Defendants were especially incensed about the removal from office of defendant Hanson's wife as Tribal Treasurer on May 15, 1979.
 
 
 12
 On the evening of May 18, 1979, a group of persons gathered at the home of defendant Hanson to discuss the possibility of taking over the Law Enforcement Center. Such discussions were interspersed with drinking and political rhetoric. At approximately 4:30 a. m., the defendants left Hanson's dwelling and proceeded to the Law Enforcement Center.
 
 
 13
 Upon their arrival all five defendants confronted a female night dispatcher and a Bureau of Indian Affairs jailer, Clayton Van Wert. Four defendants were armed with automatic weapons, while one carried a sledgehammer.
 
 
 14
 As Van Wert and the dispatcher were held in the radio room, three other officers in the Law Enforcement Center were accosted at gunpoint by defendants Cook and Roy. These individuals were Bureau of Indian Affairs Police Officer Delwyn Dudley, BIA Chief Jailer David Brown, and Tribal Police Officer Foseph Dudley, who was also a Special Deputy Officer of the BIA.
 
 
 15
 All four officers were marched at gunpoint into the "drunk tank" cell where they were locked up.
 
 
 16
 Between 5:00 and 5:30 a. m., the officers were moved to a smaller "padded" cell in which they remained until about 9:00 a. m. when Van Wert was released. The three remaining officers were released around noon on May 19, 1979, by a police captain. When they got outside, the officers were intercepted by defendant Stately and handcuffed. They were driven away and later released. Each defendant at some point during the hostilities pointed a gun at the officers.[1]
 
 
 17
 Testimony from the trial court established that Van Wert, Delwyn Dudley and Brown were BIA employees of the Department of Interior and that Joseph Dudley was a Special Deputy of BIA, although a tribal employee. All were performing law enforcement duties on the Red Lake Indian Reservation.
 
 I. Justification as a Defense
 
 18
 Defendants assert a denial of their right to a fair trial and due process of law by the trial court's refusal to instruct the jury on the defense of "justification" or "choice of evils". They would in effect have us believe that their acts were justified and therefore not criminal in light of their alleged dehumanization by Mr. Jourdain. Such contention is beyond the realm of reality and has no merit.
 
 
 19
 This court has stated in United States v. Kroncke, 459 F.2d 697, 703 (8th Cir. 1972), quoting United States v. Moylan, 417 F.2d 1002, 1008 (4th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970):
 
 
 20
 Among philosophers and religionists throughout the ages there has been an incessant stream of discussion as to when, if at all, civil disobedience, whether by passive refusal to obey a law or by its active breach, is morally justified. However, they have been in general agreement that while in restricted circumstances a morally motivated act contrary to law may be ethically justified, the action must be non-violent and the actor must accept the penalty for his action. In other words, it is commonly conceded that the exercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law.
 
 
 21
 Defendants cite Model Penal Code Section 3:02 (Proposed Official Draft, 1962), as recognizing a choice of evils defense in criminal law. The crux of the matter is that a jury should be asked to acquit a defendant because his act, though evil, is less evil than the wrong he seeks to prevent by its commission. While such may serve to lessen the bounds of responsibility in some circumstances, it does not suffice to afford justification for what took place here. Whatever the evils, if any, of Mr. Jourdain, they were not of a magnitude to justify anarchy.
 
 
 22
 II. Official Capacity and Duty Status of Each Alleged Assault Victim
 
 
 23
 To gain a conviction on the assault charges the Government had to prove the victims were officers or employees of the Department of the Interior and were engaged in or in performance of their official duties. Such issue is one of fact for determination by the jury. Walks on Top v. United States, 372 F.2d 422 (9th Cir. 1967). The position of the defendants is that the officers were in reality under the "control" of local political leaders such as to fall without the purview of this requirement. Additionally, the defendants suggest that the jury was ambiguously instructed as to the fact that it was up to them to make such a determination. We cannot agree.
 
 
 24
 Defendants themselves concede in their own briefs that Indian Field Service persons could be "employees" under the statute. See Stone v. United States, 506 F.2d 561 (8th Cir. 1974), cert. denied, 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 650. They remain steadfast however to their claim of improper jury instruction.
 
 
 25
 A look at the record[2] shows that Judge Devitt clearly instructed the jury twice as to the government's burden of proof in this area. He stated:
 
 
 26
 The essentials which the government must prove in order to justify a verdict of guilty are:
 
 
 27
 First, that each defendant forcibly assaulted, impeded, intimidated or interfered with an officer of the Bureau of Indian Affairs of the United States Department of the Interior, while such officer was engaged in the performance of his official duties, as charged in the indictment.
 
 
 28
 Secondly, that each defendant used a deadly or dangerous weapon in the commission of that offense.
 
 
 29
 Thirdly, that he did it willfully.
 
 
 30
 Judge Devitt then restated these requirements.[3]
 
 
 31
 First, that he did the assault, or the impeding upon a BIA officer when he was about his official job. Secondly, that he used a dangerous and deadly weapon in the commission of the offense, and thirdly, that he did it willfully.
 
 
 32
 The Government contends, and we agree, that in light of the foregoing, it is inconceivable that the judge did not correctly advise the jury that the assault must have been committed against a BIA officer in the performance of his official duties.
 
 
 33
 III. Intoxication as a Defense to Specific and General Intent Crimes
 
 
 34
 All parties concede that the trial court properly instructed the jury concerning the charge of conspiracy and its required element of specific intent. The problem presented, however, is whether a similar intoxication instruction should have been given regarding the assault counts. The defendants allege that the court's instructions regarding the issue of assault were contradictory and erroneous. They further complain that one of the elements listed by the trial judge to comprise the crime of assault was willfullness, which he previously defined as requiring specific intent. Defendants would distinguish the crime of assault from that of assault on a federal officer, the latter, in their view requiring specific intent. We disagree. The Supreme Court has stated in United States v. Feola, 420 U.S. 671, 95 S.Ct. 1264, 43 L.Ed.2d 541 (1975):
 
 
 35
 We conclude, from all this, that in order to effectuate the congressional purpose of according maximum protection to federal officers by making prosecution for assaults upon them cognizable in federal courts, § 111 cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer. All the statute requires is an intent to assault, not an intent to assault a federal officer.
 
 
 36
 Defendants agree that criminal assault is a general intent crime. The defense also supports the premise that voluntary intoxication cannot negate a general intent crime. United States v. Johnston, 543 F.2d 55, 57 (8th Cir. 1976).
 
 
 37
 Barrett is the lone defendant to raise the intoxication issue as it regards assault. In light of the aforementioned authority, such a defense is in our view unavailable in this situation.
 
 
 38
 Even were we to agree that assault were a specific intent crime, it cannot be said that Barrett's actions were not done purposely and knowingly.
 
 
 39
 IV. Instruction on the Greater and Lesser Included Offenses
 
 
 40
 The defendants were charged with assaulting a federal officer with a dangerous weapon in violation of 18 U.S.C. § 111. The same statute also provided a lesser penalty for assault where no dangerous weapon is used. Two defendants, Harry Hanson and Thomas Barrett, alleged that if they committed an assault, it was without a weapon. Judge Devitt gave the following instruction on the lesser included offense:
 
 
 41
 So, if you should find that one or more of them are not guilty of one or more of these counts of assaulting with a dangerous weapon then you should make a judgment as to whether or not they're guilty of assault without a dangerous weapon, * * *.
 
 
 42
 An objection was made to the instruction.
 
 
 43
 This instruction is essentially the form instruction found in Devitt and Blackmar, Federal Jury Practice and Instructions, § 18.05 or more specifically in § 42.09 and supported by Fuller v. United States, 407 F.2d 1199, 1227-32 (D.C. Cir. 1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969). In United States v. Tsanas, 572 F.2d 340, 346 (2nd Cir. 1978), it is stated:
 
 
 44
 Neither an instruction which requires a unanimous verdict of not guilty of greater offense before allowing the jury to move to the lesser, nor an instruction that it is sufficient to move to the lesser if the jury cannot reach agreement on a conviction for the greater offense, is wrong as a matter of law, and the court may give the one that it prefers if the defendant expresses no choice; if he does, court should give the form of instruction which defendant seasonably elects.
 
 
 45
 The defense in this case specifically requested the § 42.09 form instruction in Devitt and Blackmar, Federal Jury Practice and Instructions.[4] A look at such section reveals a strong similarity in what appears and what was actually given. To sustain defendants' assertion that a better form of instruction might have resulted in several defendants being convicted of a lesser included offense would be to allow them to undo that which they themselves wanted accomplished.
 
 
 46
 V. Restriction of Cross-Examination and Argument as Regards Due Process
 
 
 47
 The District Court in rejecting the defendants' theory of justification as a rule of law, also refused the introduction of evidence relating to the defense. Defendants claim this unfairly limited their cross-examination of witnesses. Defendants specifically cite the admission of part of a statement by defendant Hanson and the court's refusal to allow the defense to cross-examine on a portion which was excluded. This, along with the trial court's reprimanding of defense counsel in the jury's presence, created what defendants term an ambiguous state of affairs. We fail to see where the trial court's denial of questions touching on the issues of motive and justification unfairly and prejudicially limited cross-examination by the defense.
 
 
 48
 Rule 403 of the Federal Rules of Evidence affords the court with much leeway in admitting or excluding evidence. United States v. Johnson, 516 F.2d 209 (8th Cir. 1975); United States v. Eagan, 516 F.2d 1392 (8th Cir. 1976). See also, Federal Rule of Evidence 611(a), which explicitly vests control over the manner in which testimony is elicited in the trial court. United States v. Jackson, 549 F.2d 517 (8th Cir. 1977), cert. denied, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977); Smith v. Conley, 584 F.2d 844 (8th Cir. 1977). The District Court determined as a matter of law that the defense of justification was inapplicable, and thereafter, appropriately we feel, excluded all evidence relating thereto.
 
 
 49
 VI. Inquiry on Voir Dire as to the Effect of Pretrial Publicity and Racial Bias of the Jury
 
 
 50
 Defendants question whether an exhausting, probing voir dire was properly conducted so as to expose any effects of pretrial publicity and possible racial bias harbored by the jury.
 
 
 51
 Upon submission to the court of defendants' proposed request for voir dire, the court responded that it would " * * * ask the gist of them." The general question posed to the panel was: "Have any of you had any inordinate experiences, with American Indians? If so, would you please raise your hands?" The specific question asked of each juror was, "Do you know of any reason why you could not be be a fair and impartial juror?"[5]
 
 
 52
 Rule 24(a) of the Federal Rules of Criminal Procedure enunciates the proposition that the trial court has broad discretion in administering voir dire and that only an abuse of discretion is reversible error. United States v. Delay, 500 F.2d 1360 (8th Cir. 1974); Pope v. United States, 372 F.2d 710 (8th Cir. 1967). For there to be a reversal, any abuse found must substantially prejudice a defendant's case. United States v. Crow Dog, 532 F.2d 1182 (8th Cir. 1976). While we fail to define specifically the meanings of exhaustive and probing as it relates to voir dire, it seems that that conducted by the trial court was sufficiently comprehensive to expose any underlying prejudices.
 
 
 53
 VII. Failure to Use Tribal Membership Rolls in the Federal Jury Selection
 
 
 54
 Defendants submit that the District Court erred in refusing to dismiss the indictment on grounds that the plan for jury selection for the District of Minnesota violated: (1) 28 U.S.C. § 1863(b)(3); (2) due process and equal protection per the fifth amendment to the United States Constitution; and, (3) the sixth amendment of the United States Constitution and its guarantee of a jury comprising a fair cross section of the community. We disagree.
 
 
 55
 The plan for selection of grand and petit jurors in Minnesota provides for random selection from voter registration lists.[6] The voter registration list used as the primary source here did not include those persons who voted in the Red Lake Tribal elections.
 
 28 U.S.C. § 1861 provides:
 
 56
 It is the policy of the United States that all litigants in Federal Courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.
 
 
 57
 As a corollary to § 1861 and relating to jury selection procedures, 28 U.S.C. § 1863 states in part:
 
 
 58
 They shall ensure that names of persons residing in each of the counties, parishes, or similar political subdivisions within the judicial district or division are placed in a master jury wheel; * * *
 
 
 59
 We should take note that the tribal roll is not a voter registration list. Rather, it is a list of all persons who are eligible to be enrolled as members of the tribe and who have chosen to be enrolled. This list is not contingent on being a Red Lake or a Minnesota resident and consequently, does not include some who are Red Lake residents.
 
 
 60
 The government contends that while such a roll does provide the basis for eligibility to vote in tribal elections, it is in no way a reflection of "the Indian people who live, work and vote on the Red Lake Reservation." Further, they assert that the registered voters list for Beltrami County, which incorporates the majority of Red Lake residents, is the only fair way of representing the reservation's residents since the tribal enrollment list excluded some Indian and non-Indian residents and includes a majority of Red Lake residents, including some non-Minnesota residents. It would seem that any failure in representation afforded the Red Lake residents would evolve from their failure to register to vote in the county elections themselves. In United States v. Freeman, 514 F.2d 171 (8th Cir. 1975), it is said at 173:
 
 
 61
 * * * the voting lists must be supplemented to obtain jurors from a fair cross section of the community only "where obstacles are placed in the paths of certain citizens attempting to register to vote."
 
 
 62
 The Minnesota Jury Selection Plan for the United States District Court now under attack has received approval by the Eighth Circuit Court of Appeals in Hallman v. United States, 490 F.2d 1088 (8th Cir. 1973).
 
 
 63
 The District Court questioned if Indian people constituting 1.34% of the population of the Sixth Division of Minnesota were a distinctive group for the purposes of cross-section requirement. In Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the court said:
 
 
 64
 In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
 
 
 65
 In the instant case, a motion to dismiss was filed raising the same grounds and this was completely answered by Judge Devitt's memorandum and order reported at 472 F.Supp. 1049. See his discussion under "Sixth Amendment" and "Equal Protection".
 
 
 66
 We fail to find fault with the jury selection procedures and likewise dismiss defendants' claim in this context as without merit.
 
 
 67
 AFFIRMED.
 
 
 
 *
 The Honorable Daniel H. Thomas, Senior United States District Judge, Southern District of Alabama, sitting by designation
 
 
 [1]
 T. Vol. 2, p. 187
 
 
 [2]
 T. Vol. 5, p. 16
 
 
 [3]
 T. Vol. 5, p. 16
 
 
 [4]
 T. Vol. 4., p. 173
 
 
 [5]
 T. 1-13
 
 
 [6]
 Defendant's exhibit 1, MT 1, 28. References to July 2 motion hearing = MT 1