COMMONWEALTH vs. GEORGE O. EDGERLY.

Middlesex.    September 9, 1981. — May 21, 1982.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

*Rape. Rape-Shield Statute. Constitutional Law,* Ex post facto law. *Evidence,* Fresh complaint, Prior conviction, Cumulative, Consciousness of guilt, Reputation. *Error,* Harmless. *Practice, Criminal,* Indictment, Grand jury proceedings, Instructions to jury, Lesser included offense.

At the trial of an indictment charging sexual crimes, the rape-shield statute, G. L. c. 233, § 21B, was properly applied to exclude certain evidence even though the crimes had been committed before the statute was enacted. [565-569]

On appeal of a rape conviction there was no merit to the defendant's contention that a witness's testimony regarding the victim's statement to a court clerk on the day after the incident was inadmissible as a fresh complaint because it came too late in "the progression of circumstances, not time." [569]

Although the judge at the trial of an indictment charging rape erroneously ruled that the record in a paternity proceeding against the defendant would be admissible to impeach the defendant's credibility if he chose to testify, the error was harmless in view of the defendant's other convictions and in view of the innocuous nature of the paternity proceeding. [569-572]

Testimony by a witness at the trial of a rape indictment, that she had overheard the defendant make a statement to the effect that he would bribe a witness to refuse to testify, was properly allowed as an admission. [572-574]

On appeal of a rape conviction the defendant's objection that the prosecutor was improperly allowed to bolster the victim's in-court testimony with prior consistent statements was rendered immaterial by the jury's verdict, demonstrating that the jury had not believed the testimony in question. [574]

The defendant at a criminal trial could not have been prejudiced by the prosecutor's final questions to two witnesses, who had admitted that at least part of their grand jury testimony had been false, as to whether the witnesses were now telling the truth. [574-575]

There was no reversible error in the admission at the trial of a rape indictment of testimony by the owner of a bar that the victim had "behaved well" when she frequented his establishment and that during the last three months that she had been a customer of the bar he had never seen her drunk. [575-577]

Although at a rape trial certain witnesses admitted that they had lied to the grand jury which had returned the indictment against the defendant, there was no merit to the defendant's contention that the grand jury proceedings were unconstitutional as a result, where the false statements in question were not material to the indictment and where it was apparent from the grand jury minutes that certain of the statements had not been made before the grand jury. [577-580]

At the trial of a rape indictment there was no error in the judge's charge to the jury that rape requires that the victim be compelled "to submit by force and against [her] will," equating "against her will" with "without her consent." [580-581]

There was no merit to the defendant's contention that the jury at a rape trial were misled in their consideration of the specific intent required for conviction of assault with intent to rape. [581]

Instructions by the judge in a rape case in answer to a question by the jury respecting deliberations on major offenses and lesser included offenses did not in any way coerce the jury or create any risk of a miscarriage of justice. [581-583]

INDICTMENT found and returned in the Superior Court on April 15, 1975.

The case was tried before *Alberti*, J.

*John P. Courtney* for the defendant.

*Kevin J. Ross*, Legal Assistant to the District Attorney, for the Commonwealth.

GOODMAN, J. The defendant was indicted for rape in two counts. The bill of particulars on one count alleged rape involving natural sexual intercourse and the bill of particulars on the second count alleged rape involving unnatural sexual intercourse. G. L. c. 265, § 22 (as appearing in St. 1974, c. 474, § 1). His jury trial resulted in a verdict of guilty of so much of the first count as charged him with assault with intent to rape and a verdict of guilty on the second count. He was sentenced to concurrent terms of eighteen to thirty years at Massachusetts Correctional Institution, Walpole.

We summarize the facts as the jury could have found them. The victim met the defendant at the Cosmopolitan Cafe in Lowell on the evening of January 1, 1975. She had previously been introduced to the defendant and had seen him at the café about five times; she had never seen him at any other place. At his invitation she joined him for a drink. The two then proceeded to another local bar where they met two men, Thomas Purtell and Thomas Flynn. She had three drinks there and the defendant and Purtell ate some pills. Flynn "was already loaded." At some point (the victim testified that it was about one-half hour later) the victim told the defendant that she wanted to return to the Cosmopolitan Cafe; he offered to drive her. Joined by Purtell and Flynn, they went to the defendant's car, whereupon Purtell took the driver's seat, Flynn sat in the front seat, the defendant sat in the back seat with the victim. When the car started to move, the defendant began to make sexual advances to the victim and attempted to have sexual intercourse with her which she struggled to prevent. From the jury's verdict it appears that they did not find penetration in spite of the victim's testimony that he "got it in part way" though he did not achieve an erection. Thereafter, he proceeded to perform cunnilingus on the victim and then "grabbed [her] head and made [her] put [her] mouth on his penis." The car stopped and Purtell then went into the back seat and also, by threat, forced the victim to perform fellatio. Thereupon, Flynn, upon the defendant's insistence, got into the back seat but agreed to let the victim "fake" the act with him.

The group then returned to the Cosmopolitan Cafe, and the victim ran inside crying. The bartender, who knew her, called a cab to take her home. When she arrived home she was (as her roommate Terry St. Pierre testified) "crying and hysterical." The victim told St. Pierre that she had been raped, and St. Pierre called the police. Officer Paquette testified that when he arrived, the victim was "crying and shaking." The police took the two women to the station where the victim gave a statement; they were then

taken to a hospital in the early hours of January 2, where the victim was examined. The doctor testified that the victim's emotional condition was consistent with real, not feigned, anxiety and that she had to be given a sedative.[1]

Later the same day the police took the victim and St. Pierre to the Lowell District Court to get complaints for rape involving natural sexual intercourse and rape involving unnatural sexual intercourse. The testimony of Officer Paquette and the testimony of the clerk are contradictory as to what took place, but ultimately the clerk refused to issue a complaint for rape involving natural sexual intercourse but issued a complaint for rape involving unnatural sexual intercourse and a complaint for assault with intent to rape.

On January 6, 1975, the victim went to the police and told them that the defendant had offered her $2,000 to drop the case and signed a statement to that effect. This statement, she testified at trial, was entirely false.[2] Subsequently, on April 15, 1975, the indictment described above was issued; we assume the complaints were dismissed. The details of other testimony and proceedings will be set out as they bear on the various contentions of the defendant. We discuss these contentions in the order argued by present appellate counsel, addressing first the two arguments he incorporated from the former appellate counsel's brief.

1. The defendant contends that the rape-shield law, G. L. c. 233, § 21B, enacted by St. 1977, c. 110, was an ex post facto law in violation of the United States Constitution, art. I, § 9, cl. 3, if applied (as it was) to his trial in September, 1977, for a rape committed on January 1, 1975. The short answer is that at trial the ex post facto provision contained in the United States Constitution was not argued or

---

[1] Officer Paquette also testified that the following day the victim was still "very disoriented, very nervous."

[2] She testified that she "wanted to scare [Edgerly] to see if he would pay the money and then go to the police and tell them right away, that would trap him more, you know, for people to believe us."

even mentioned to the trial judge. We are not inclined to decide this issue without a clear factual record which is absent in this case.

So far as appears, the primary matter argued before the trial judge was the admissibility of evidence of a tattoo on the victim which the assistant district attorney represented (and defense counsel did not dispute) "reflected a prior sexual act with another woman." This evidence of a specific sexual act would not have been admissible even prior to the rape-shield law. *Commonwealth* v. *Regan*, 105 Mass. 593, 594 (1870). *Commonwealth* v. *Gouveia*, 371 Mass. 566, 569 (1976). And thus the defendant cannot complain that under the old law he would have been allowed to introduce it. Indeed that evidence might have been admissible under the present law after a voir dire and a finding that "the weight and relevancy of said evidence is sufficient to outweigh its prejudicial effect to the victim . . . ." G. L. c. 233, § 21B. The trial judge offered to hold such a voir dire, but defense counsel refused. Before the rape-shield law, the only evidence admissible as to the victim's sexual conduct with others was evidence of reputation for lack of chastity. From the transcript it appears (though it is not clear) that defense counsel indicated a desire to introduce such evidence but made no offer of proof.

Thus, the issue before us is whether, as a matter of the intent of the Legislature, the statute was meant to be retrospective and therefore completely barred any reputation evidence. G. L. c. 233, § 21B (first sentence). Such an intent must be clearly expressed particularly because of the "'influence — if not the command' of the ex post facto provisions . . . ." *Commonwealth* v. *Davis*, 380 Mass. 1, 16 (1980), quoting from *Byrd* v. *Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 537 (1958). *Commonwealth* v. *A Juvenile (No. 2)*, 384 Mass. 390, 391 n.1 (1981).

Here the intent seems to us clear that the statute be retrospective, and a contrary construction would be "inconsistent with the manifest intent of the lawmaking body or repugnant to the context of the same statute." G. L. c. 4, § 6,

first par. The title of St. 1977, c. 110, is: "An Act regulating the admissibility of certain evidence in rape cases." The act inserts G. L. c. 233, § 21B, which begins: *"Evidence* of the reputation of a victim's sexual conduct shall not be admissible in any *investigation or proceeding* before . . . any court of the commonwealth for a violation of . . . [G. L. c. 265, § 22]" (emphasis supplied). Rules of evidence are generally retrospective. *Commonwealth* v. *Greenberg*, 339 Mass. 557, 578-579 (1959). See *Kerr* v. *Palmieri*, 325 Mass. 554, 557 (1950); *Goodwin Bros. Leasing* v. *Nousis*, 373 Mass. 169, 173 (1977), quoting from *Hanscom* v. *Malden & Melrose Gas Light Co.*, 220 Mass. 1, 3 (1914). See also *Thompson* v. *Missouri*, 171 U.S. 380, 387 (1898). And the Legislature is presumed to be aware of that rule. *Forcier* v. *Hopkins*, 329 Mass. 668, 671 (1953). Further, the statute applies to "any proceeding" and it is thus at such a point that the statute is made applicable rather than at the point of the offense. *Goodwin Bros. Leasing* v. *Nousis*, 373 Mass. at 173. *Zildjian* v. *Zildjian*, 8 Mass. App. Ct. 1, 8-9 (1979). The statute makes no distinction between offenses committed before its passage and offenses committed thereafter.

Most convincing is the preamble to St. 1977, c. 110, which declares that "[t]he deferred operation of this act would tend to defeat its purpose, which is to protect *immediately* victims of rape . . ." (emphasis supplied). The purpose is manifest. It demonstrates "sensitivity for the rape victim's plight." *Globe Newspaper Co.* v. *Superior Court*, 379 Mass. 846, 858 n.9 (citing G. L. c. 233, § 21B), vacated on other grounds, 449 U.S. 894 (1980), S.C., 383 Mass. 838 (1981). The court in that case points out that "the Legislature wished [generally] to shield certain victims of sex crimes from the difficult experience of testifying in public . . . . The rape victim's ordeal in court has been well documented. It has been said that '[t]he court experience, for the rape victim, precipitates as much of a psychological crisis as the rape itself.' In fact, the victim may feel that she has been raped twice: once by the defendant and once by the criminal justice system." *Globe Newspaper Co.* v.

*Superior Court*, 379 Mass. at 858-859 (footnotes omitted). *Commonwealth* v. *Manning*, 367 Mass. 605, 613-614 (1975) (Braucher, J., dissenting) (pointing out that under then existing law "the complaining woman in a rape case is fair game for character assassination"). *Commonwealth* v. *Joyce*, 382 Mass. 222, 228 (1981). Burnim, Massachusetts Rape-Shield Law — An Over-Step in the Right Direction, 64 Mass. L. Rev. 61 (1979), points out that "[r]ules of evidence applied in the context of a rape trial often led to a curious reversal of roles whereby the victim found herself defending her character for chastity . . . ." See also *id.*, nn.3 & 7. Dushman, Legislation-Admissibility of Evidence of Sexual Conduct of Victim in Sexual Assault and Rape Cases, 1977 Ann. Survey Mass. Law § 7.1. See *People* v. *Conyers*, 86 Misc.2d 754, 764 (N.Y. Sup. Ct. 1976), aff'd, 63 App. Div.2d 634 (N.Y. 1978). The purpose here to protect victims of rape by a change in evidentiary rules is effected at the trial, for it is at that point that they need protection. This purpose applies to victims of rape committed before or after the passage of the rape-shield law, and the Legislature hardly could have intended to distinguish between them in a statute by which it intended to reform the rules of evidence in rape cases. See *Zildjian* v. *Zildjian*, 8 Mass. App. Ct. at 10-11; *Gleason* v. *Gleason*, 26 N.Y.2d 28, 38 (1970) (holding retroactive changes in the divorce law because "the legislative purpose of effectively reforming the State's divorce law would [otherwise], to a large extent, be defeated").

We have found only a few cases dealing with the intent of the Legislature to make a rape-shield law retrospective, and in these cases such laws have been uniformly held retrospective. See *People* v. *Dorff*, 77 Ill. App. 3d 882, 887 (1979); *State* v. *Holmes*, 157 N.J. Super. 37, 39 (1978). Moreover, the other cases which we have found,[3] involving only discus-

---

[3] *Turley* v. *State*, 356 So. 2d 1238, 1243-1244 (Ala. Crim. App. 1978). *People* v. *Mandell*, 61 App. Div.2d 563, 565-566 (N.Y. 1978), rev'd on other grounds, 48 N.Y.2d 952 (1979). *People* v. *Conyers*, 86 Misc.2d at 761-762.

sions of the ex post facto laws, go directly to the ex post facto provisions, assuming sub silentio retroactivity as a matter of legislative intent. The defendant has pointed to no case in which a rape-shield law has been held prospective only or unconstitutional under the ex post facto clause, and we have found none.

2. We see no substance to the defendant's contention that St. Pierre's testimony regarding the victim's statement to the clerk of the District Court on the day after the incident was inadmissible as fresh complaint because it came too late in "the progression of circumstances, not time."[4] The testimony was cumulative, and the instructions limiting the testimony to corroborating evidence were clear. The testimony was not "such as would render [it] more prejudicial than probative." *Commonwealth* v. *Manning*, 6 Mass. App. Ct. 430, 434 (1978).[5]

3. Close to the end of the defendant's case in chief, his counsel asked for a bench conference to have the judge review the convictions which the Commonwealth would introduce to impeach the defendant if he took the stand.[6]

---

[4] The defendant points out that the victim had expressed her complaint on three prior occasions — to St. Pierre upon arriving home, to the police, and to the doctor — and concludes that thus the statement to the clerk was too remote.

[5] We see no danger here that the testimony would inflame the jury. *Commonwealth* v. *Bailey*, 370 Mass. 388, 393 (1976). *Commonwealth* v. *Blow*, 370 Mass. 401, 404 (1976). And the judge was within the bounds of his discretion. *Commonwealth* v. *McCarthy*, 12 Mass. App. Ct. 722, 728 (1981). See generally *Commonwealth* v. *Cleary*, 172 Mass. 175, 177 (1898); *Commonwealth* v. *Rollo*, 203 Mass. 354, 355 (1909); *Commonwealth* v. *Ellis*, 319 Mass. 627, 629-630 (1946); *Commonwealth* v. *Hanger*, 357 Mass. 464, 466 (1970); *Commonwealth* v. *Lund*, 5 Mass. App. Ct. 884, 885 (1977); *Commonwealth* v. *Manning*, 6 Mass. App. Ct. at 434; *Commonwealth* v. *Bishop*, 9 Mass. App. Ct. 468, 473 (1980); *Commonwealth* v. *Hannaford*, 10 Mass. App. Ct. 903, 903-904 (1980).

[6] General Laws c. 233, § 21 (as amended by St. 1950, c. 426), provides in relevant part:

"The conviction of a witness of a crime may be shown to affect his credibility, except as follows:

*Commonwealth* v. *Chase*, 372 Mass. 736, 749 (1977). *Commonwealth* v. *Diaz*, 383 Mass. 73, 81, 82 (1981). The Commonwealth asserted that if the defendant took the stand, it would present convictions of larceny, conspiracy to commit larceny, Federal larceny, and eighteen counts of larceny of under $100. The assistant district attorney then asserted that he would offer a proceeding initiated in 1961, for which the entry in the probation report — and that is all we have before us — is set out in the margin.[7]

The defendant argues that the trial judge was in error in ruling the record of this proceeding admissible and that as a result he did not take the stand. We agree with the defendant; the admission of the illegitimacy proceeding would have been erroneous.

Even a cursory look at the record indicates that it contains no criminal sanction. See note 7, *supra*, and *Commonwealth* v. *MacKenzie*, 368 Mass. 613, 617 (1975), holding that the statute at issue (G. L. c. 273, § 11, which was repealed by St. 1977, c. 848, § 7) was not defective "to the extent that it is used to establish paternity and obliged the father to contribute toward pregnancy and childbirth expenses."

Further, the judge apparently relied on the fact that G. L. c. 273, § 11, provided that "whoever, not being the

"First, The record of his conviction of a misdemeanor shall not be shown for such purpose after five years from the date on which sentence on said conviction was imposed, unless he has subsequently been convicted of a crime within five years of the time of his testifying.

"Second, The record of his conviction of a felony upon which no sentence was imposed or a sentence was imposed and the execution thereof suspended, or upon which a fine only was imposed, or a sentence to a reformatory prison, jail, or house of correction, shall not be shown for such purpose after ten years from the date of conviction . . . . For the purpose of this paragraph, a plea of guilty or a finding or verdict of guilty shall constitute a conviction within the meaning of this section."

[7]"Jun[e] 6, [19]62-Adj. Father; Probation, 6 years & $7.50 weekly order; plus $798.45 Conf[inement] Expenses; Jun[e] 28, [19]68 — Dismissed."

husband of a woman, gets her with child shall be guilty of a *misdemeanor*" (emphasis supplied). But even if this were considered a misdemeanor, it would be inadmissible under G. L. c. 233, § 21, since no sentence was imposed. The defendant was placed on probation; and the law is clear that "[m]erely showing a verdict of guilty or placing a defendant on probation does not satisfy the statute." *Commonwealth v. Hersey*, 324 Mass. 196, 205 (1949). *Forcier v. Hopkins*, 329 Mass. at 671. *Commonwealth v. Devlin*, 365 Mass. 149, 163 (1974). The amendment (St. 1950, c. 426) did indeed change a portion of G. L. c. 233, § 21; but there was no change in the first part of the statute relating to misdemeanors. *Commonwealth v. Devlin*, 365 Mass. at 163.

The trial judge also committed error in his ruling that "the law says I must admit them for purposes of impeachment," and further, "I'm not saying what I think about it, . . . I have no right to think about it." However, such a right was expressly provided in *Commonwealth v. Chase*, 372 Mass. at 750, decided approximately three months before the trial in this case. The court held that "[a]lthough . . . [c. 233, § 21] does not give the judge any discretion to exclude the evidence . . ., we would not deny the right of a judge to avoid any question of unfairness by excluding such evidence in a situation where the likely prejudice to the defendant is most intense." While the exercise of this right was not put in terms of "reviewable discretion" (*Commonwealth v. Diaz*, 383 Mass. at 80), a judge *may* exclude convictions "to avoid any question of unfairness." *Commonwealth v. Chase*, 372 Mass. at 750. "If a conviction is admissible under the statute, a judge *may* exclude it, but it is not error to admit it" (emphasis supplied). *Commonwealth v. McTigue*, 384 Mass. 814, 815 (1981), quoting *Commonwealth v. Tabor*, 376 Mass. 811, 824 (1978). It is one thing to consider that right and exercise it either way, but having been given that right, analogous to discretion, it is the duty of the judge to exercise it, and it is error as a matter of law to refuse to exercise it. See generally *Commonwealth v. Fontain*, 127 Mass. 452, 455 (1879); *Peterson v. Cadogan*, 313

313 Mass. 133, 134 (1943); *Commonwealth* v. *Fillippini*, 1 Mass. App. Ct. 606, 611 (1973).

We believe, however, that had the 1961-1962 illegitimacy proceedings been introduced, it would have been harmless error. The jury would have been instructed that this proceeding and the convictions properly admitted could be used only in connection with the defendant's credibility. We cannot believe that the jury would have attached any significance in that connection to the fifteen year old finding of the defendant's paternity of an illegitimate child[8] — particularly since the record indicates nothing but fornication, with an unfortunate result to be sure, for which the defendant apparently fulfilled his obligation. (See note 7, *supra.*) The illegitimacy proceeding would have had no effect on the jury's decision on credibility, particularly in view of the Federal larceny conviction, the two 1976 convictions for larceny and conspiracy to commit larceny, and the convictions in 1962, relatively soon after the paternity adjudication, on eighteen counts of petit larceny in connection with unemployment checks. See *Gilday* v. *Commonwealth*, 355 Mass. 799 (1969); *Commonwealth* v. *Boudreau*, 362 Mass. 378, 382 (1972) (erroneously admitted conviction harmless beyond a reasonable doubt in light of the dubious significance of the violation in and light also of the admission of the defendant's conviction for assault and battery). See also *Commonwealth* v. *Brown*, 2 Mass. App. Ct. 76, 83 (1974).

4. A witness, Barbara Kittell, was properly permitted to testify to what she overheard the defendant state in a conversation with St. Pierre in the Cosmopolitan Cafe. Kittell testified that she overheard the defendant say something to the effect, "All right. I'll pay the two thousand dollars . . . . I'm tired of fooling around. I don't want to be hassled any more. I'm tired of all this hassle." The judge correctly admitted the testimony as an admission. See *Commonwealth* v. *Gleason*, 262 Mass. 185, 190 (1928); Liacos,

---

[8] Compare the Proposed Mass.R.Evid. 609(c) (July, 1980), providing that no conviction may be introduced after it is fifteen years old.

Massachusetts Evidence 276 (5th ed. 1981); Proposed Mass. R.Evid. 801(d)(2) (July, 1980); Fed.R.Evid. 801(d)(2).

The defendant's statement that he would pay $2,000 was corroborative of St. Pierre's testimony, as to which there was no contention either at trial or in the defendant's brief that it was erroneously admitted. Kittell's testimony tended to prove, at minimum, that the defendant was involved in the incident of January 1, 1975. His statement was in effect an offer to bribe a witness to refuse to testify which "may imply that the party making the [bribe] has something specific to hide. The desire to 'cover something up' in turn implies a consciousness of guilt of the particular crime charged." *United States* v. *Gonsalves*, 668 F.2d 73, 75 (1st Cir. 1982). *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 51-52 (1975). *Commonwealth* v. *Leo*, 379 Mass. 34 (1979). See 2 Wigmore, Evidence §§ 273-277 (Chadbourn rev. 1979).

The defendant also argues on appeal that even if Kittell's testimony was an admission, it was the result of coercion and still inadmissible. We disagree. There was evidence that St. Pierre and the victim had telephoned the defendant's home three days after the incident occurred; the two offered to drop the charges against the defendant if he would pay them $2,000. But he refused and had no further communication with the two women on the subject until nine days later when he approached them at the Cosmopolitan Cafe. The victim started to cry and backed away from the defendant. These actions were obviously not of the type calculated to coerce an admission. Further, the defendant initiated the conversation with St. Pierre, and it was during that conversation that he made the statement Kittell overheard. Indeed, the defendant did not make an argument at trial on the issue of voluntariness. This meager evidence was insufficient to raise a "substantial claim of involuntariness." *Commonwealth* v. *Harris*, 371 Mass. 462, 470 (1976).[9] It is thus clear that at the time the defendant ap-

---

[9] It was insufficient to require the trial judge to make a sua sponte determination of the voluntariness of the defendant's admission. *Common-*

proached the victim and her friends in the Cosmopolitan Cafe and offered to pay money to the victim, he was acting voluntarily.

5. The defendant contends that it was error to "allow[ ] the Commonwealth to bolster [the victim's] in-court testimony with prior consistent statements." The argument is without substance for the testimony sought to be "bolstered" was the victim's testimony that the defendant had "got it in part way, half way." But this testimony was not believed by the jury despite the consistent statements for they found the defendant guilty on the first count only of assault with intent to rape, rather than rape. The argument thus becomes pointless. "[T]he evidence . . . was rendered immaterial by the jury's verdict that the defendant was guilty of assault with intent to [rape] rather than [rape]." *Commonwealth* v. *Costa*, 2 Mass. App. Ct. 854, 855 (1974), and cases cited.

6. Similarly otiose is the defendant's objection to the Commonwealth's final questions to two witnesses who had admitted at the trial that at least part of their grand jury testimony had been false. Those questions were as to whether, apart from the testimony admittedly false, the witnesses were now telling the truth. They answered in the affirmative. We cannot see how the jury could have been misled in any way. Both witnesses were obviously presenting their sworn testimony as the truth. Further, the jury were carefully told both in the instructions preliminary to the trial and in the charge that they were "the sole judges of the credibility of the witnesses." This was complemented in careful detail as to the factors to be used by the jury in assessing credibility. "No special force or credibility attached to the testimony of the prosecution's witnesses" because of those questions and answers. *Commonwealth* v.

_wealth_ v. *Harris*, 371 Mass. at 470. The judge had no duty to instruct the jury on voluntariness unless it was made "a live issue at trial." *Commonwealth* v. *Pratt*, 360 Mass. 708, 714-715 (1972). *Commonwealth* v. *Alicea*, 376 Mass. 506, 523 (1978). *Commonwealth* v. *Brady*, 380 Mass. 44 (1980). *Commonwealth* v. *McCarthy*, 385 Mass. 160 (1982).

*McCauley*, 355 Mass. 554, 560 (1969). Contrast *Commonwealth* v. *Barros*, 5 Mass. App. Ct. 887 (1977).

7. The defendant contends that it was error to admit the testimony of one Koumatseas, the bartender and owner of the Cosmopolitan Cafe, that for the year and one half that he had known the victim she frequented the bar "two or three times a week, maybe" and during that time she had "behaved well." He also testified, over the defendant's objection, that, during the last three months that the victim had been a customer of the bar, he had never seen her drunk. The defendant objected on the ground that the testimony was not material, and the Commonwealth makes no contention to the contrary. It argues, rather, that "the testimony was offered to rebut testimony elicited by defense counsel during his cross examination concerning her sobriety and general behavior in public." The argument is either careless or disingenuous, for the specific instances to which the Commonwealth points, and to which the defendant's cross-examination alluded, were precisely the instances elicited by the Commonwealth in its direct examination of the victim. Obviously, the defendant was entitled to question about those instances without getting into the shoals of "collateral matters."

The Commonwealth, contrary to its duty to the court,[10] does not mention the direct examination though the sequence is clear from the transcript. The trial judge admitted Koumatseas's testimony, that during the last year and one half the victim had behaved well, as "benign"; we find it difficult to understand just what this signifies. If "benign" means irrelevant, than the trial judge should have excluded it, and if it affected the case against the defendant, then it can hardly be said to be "benign."[11]

---

[10] See S.J.C. Rule 3:22A, PF 1, 377 Mass. 923 (1979) (see now S.J.C. Rule 3:08, as appearing in 382 Mass. 797 [1981]).

[11] The Commonwealth also makes the argument, lame in the circumstances, that "in a lengthy criminal trial, some improprieties are almost unavoidable." *Commonwealth* v. *Belton*, 352 Mass. 263, 270, cert.

We see no justification for the admission of this testimony. See *Commonwealth* v. *McLaughlin*, 352 Mass. 218, 231, cert. denied, 389 U.S. 916 (1967); *Commonwealth* v. *LaCorte*, 373 Mass. 700, 706 (1977). Its thrust was to attempt to introduce by the back door evidence by Koumatseas as to the victim's character — obviously inadmissible and illustrative of the propensity of some district attorneys to attempt to "snatch defeat from the jaws of victory." *Commonwealth* v. *Jones*, 9 Mass. App. Ct. 103, 119 (1980), *S.C.* 382 Mass. 387 (1981). It is well settled that "even when character is properly in issue, it may be shown . . . only through evidence of general reputation . . . . Personal opinions and isolated acts are not evidence of general reputation." *Commonwealth* v. *Roberts*, 378 Mass. 116, 129 (1979). *Commonwealth* v. *DeVico*, 207 Mass. 251, 253 (1911) (private opinion of witness in regard to character irrelevant and immaterial). *Commonwealth* v. *Belton*, 352 Mass. 263, 269 (1967) (evidence of general reputation admissible but not evidence in form of private opinions). *Commonwealth* v. *LaPierre*, 10 Mass. App. Ct. 871 (1980) (proper to exclude testimony as to witness's bad reputation where judge determines such testimony was based on opinions of too limited a group). *Commonwealth* v. *Gomes*, 11 Mass. App. Ct. 933 (1981) (proper to exclude reputation evidence where it was based on observations of too few people).

The defendant's argument is persuasive, but a complete and careful examination of the transcript indicates that Koumatseas's testimony was of minimal importance, and we conclude that its effect was "insignificant." *LeBlanc* v. *Commonwealth*, 363 Mass. 171, 178 (1973). Though the Commonwealth's case had its weaknesses, the jury might well have been impressed by the victim's crying and hysteria

denied, 389 U.S. 872 (1967). The Commonwealth, however, fails to tell us that the following sentence in that case points out that "this one isolated remark, to which no objection was made at the trial, was not so prejudicial as to call for reversal."

when she returned from her ride with the defendant — testified to by the bartender, the police, and the doctor who examined her. The testimony of Koumatseas that "she behaved well" is so general as to be meaningless. "It seems inconceivable that such testimony [, even if it had been proper reputation evidence], 'muted and colorless' as it generally is (McCormick, Evidence § 191, at 456 [2d ed. 1972]), would have altered the jury's decision to believe the victim . . . ." *Commonwealth* v. *McCarthy*, 12 Mass. App. Ct. at 725. Moreover, this occurred in the third day of a six-day trial and was never again mentioned by either party.

Koumatseas's testimony that the victim had not been drunk in the three previous months added nothing to his testimony that on the crucial night of the incident when she left with Edgerly, she was sober. The evidence was merely cumulative. *Commonwealth* v. *Bailey*, 370 Mass. 388, 393 (1976).

8. There is no substance to the defendant's argument that the grand jury proceedings were in violation of art. 12 of the Declaration of Rights of the Massachusetts Constitution or the Fifth and Fourteenth Amendments to the United States Constitution, because the indictment was based in part on perjured testimony. At trial, the assistant district attorney elicited from St. Pierre, his own witness, that she "lied before the grand jury as to who offered who the money." On cross-examination she merely answered, "Yes," to the question: "Did you lie to the grand jury?" Both statements lacked particularity; and the trial transcript in context is concerned with the concededly false statement given to the police by the victim and St. Pierre that Edgerly had offered the victim money to drop the charges, within a few days after the incident. Both parties have argued from the generalities in the transcript. Neither has referred to the grand jury minutes by which these statements must be validated. We have examined the grand jury minutes and find that St. Pierre's testimony regarding Edgerly's offer of $2,000 referred to an occurrence at the Cosmopolitan Cafe, and that this testimony was never repu-

diated by St. Pierre. Indeed, it was corroborated by Kittell, who also testified before the grand jury. In this context, the isolated sentence in the grand jury minutes, "He even called her mother once or twice," could have no meaning for the grand jury, which had nothing before it to which that sentence could in any way relate; the false statement, to which that sentence might conceivably have referred, was not mentioned by either the victim or St. Pierre before the grand jury.[12]  See *Commonwealth* v. *Lincoln*, 368 Mass. 281, 285 (1975).

Thus, the case of *United States* v. *Basurto*, 497 F.2d 781 (9th Cir. 1974), which the defendant asks us to follow, does not avail him, for *Basurto* also requires that the perjured evidence be material.[13]  Similarly, the First Circuit Court in *United States* v. *Flaherty*, 668 F.2d 566 (1st Cir. 1981), found it unnecessary to decide whether to adopt the *Basurto* rule and its progeny, "or . . . any other rule," since the falsehoods in the *Flaherty* case were "not sufficiently material, even under the most lax standard of materiality." *Flaherty*, 668 F.2d at 584.[14]  As in our case, there was no "reasonable likelihood that the false testimony could have affected the judgment of the [grand jury]." *Flaherty*, 668 F.2d at 587, quoting *United States* v. *Agurs*, 427 U.S. 97, 103 (1976).[15]

---

[12] Indeed, it appears that the assistant district attorney did not have before him the grand jury minutes when he elicited from St. Pierre that she had lied to the grand jury. His recollection obviously was faulty in this instance. Defense counsel, of course, had no interest in correcting the assistant district attorney but rather exploited the trial testimony.

[13] The rule as set out in the *Basurto* case is: "We hold that the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is *material*, and when jeopardy has not attached" (emphasis supplied). *Basurto*, 497 F.2d at 785.

[14] See also discussion in *United States* v. *Flaherty*, 668 F.2d at 584 & n.9, of the subsequent history of the *Basurto* case in the Ninth Circuit and elsewhere.

[15] For other instances in which it has been held that grand jury proceedings were not vitiated by perjured evidence, see *United States* v. *DeLeo*,

Further, there is nothing in the record to indicate that the assistant district attorney "played an ignoble part." *Commonwealth* v. *Lincoln*, 368 Mass. at 285. There is nothing to indicate that "the prosecution solicited and used testimony that it knew to be false, of a set purpose to help to convict an accused, or, without itself soliciting such testimony, consciously used it or permitted it to be used to that end." *Ibid.*[16]

In our case, the prosecutor received a representation from St. Pierre about two days before trial that she had lied before the grand jury. It is a prosecutor's duty, of course, to transmit such information to defense counsel as soon as possible. Here nothing in the record indicates just when the material was given to the defense. However, defense counsel raised no objection to the timing of his receipt of the information, nor did he file a motion to dismiss. Rather, he sought to exploit St. Pierre's testimony to bolster his contention that the Commonwealth's entire case was based on perjured testimony.

Flynn's acknowledgment of perjury before the grand jury, elicited on cross-examination by defense counsel, was also immaterial. He acknowledged that he had lied when he told the grand jury, "She didn't run. Before she got out of the car, she said, 'This don't go any further than right here. Don't say anything to anybody.' Everybody agreed." The thrust of the testimony was to induce the grand jury to speculate that the incident took place with the victim's consent and therefore did not constitute rape. A short answer is that the grand jury, in spite of this testimony, did issue the

---

422 F.2d 487, 497 (1st Cir.), cert. denied, 397 U.S. 1037 (1970); *United States* v. *Morton-Norwich Prod., Inc.*, 461 F. Supp. 760, 766 (N.D.N.Y. 1978).

[16] *Commonwealth* v. *Lincoln*, 368 Mass. at 285, cites *United States* v. *Basurto*, 497 F.2d 781 (9th Cir. 1974), as an example of prosecutorial misconduct. In the *Basurto* case, the entire grand jury testimony, on the basis of which an indictment was obtained, was permeated by perjury which, subsequent to the indictment, became known to the assistant district attorney. *Basurto*, at 785.

indictment for rape, thus rendering the testimony immaterial.

In sum, there is no evidence of interference with the "integrity of the grand jury." *Commonwealth* v. *Gibson*, 368 Mass. 518, 525 (1975). *Commonwealth* v. *Harris*, 231 Mass. 584 (1910). *Commonwealth* v. *Lincoln*, 368 Mass. at 285. *Commonwealth* v. *Ellison*, 376 Mass. 1 (1978). *Commonwealth* v. *McCarthy*, 385 Mass. 160 (1982). *United States* v. *Cruz*, 478 F.2d 408 (5th Cir.), cert. denied sub nom. *Aleman* v. *United States*, 414 U.S. 910 (1973). *United States* v. *Gold*, 470 F. Supp. 1336 (N.D. Ill. 1979). "Minor discrepancies, if there were any, between the evidence presented to the grand jury and the evidence presented, or expected to be presented, at trial cannot invalidate the indictment. . . . The integrity of the grand jury proceedings was not impaired." *Commonwealth* v. *Dilone*, 385 Mass. 281, 284 (1982).

9. There was no error in the judge's charge tracking the provisions of the statute[17] (G. L. c. 265, § 22, inserted by St. 1974, c. 474, § 1), that rape requires that the victim be compelled "to submit by force and against [her] will" — equating "against her will" with "without her consent." *Commonwealth* v. *Roosnell*, 143 Mass. 32, 40 (1886). *Commonwealth* v. *Goldenberg*, 338 Mass. 377, 383, cert. denied, 359 U.S. 1001 (1959).

Nothing more was necessary in the circumstances of this case. The words are common words readily understood by a jury. They could be applied easily to the uncomplicated testimony of a struggle as the victim sought to prevent penetration in the back seat of the automobile and the testimony that he "grabbed [her] head and made [her] put [her] mouth on his penis." This is not a case where complications in the testimony may cause confusion unless explained. *Byrd* v. *United States*, 312 F.2d 357, 358 (D.C. Cir. 1962). *United*

---

[17] *Commonwealth* v. *Greenberg*, 339 Mass. at 585. *Commonwealth* v. *Wong*, 10 Mass. App. Ct. 906 (1980). *Lumetta* v. *United States*, 362 F.2d 644, 648 (8th Cir. 1966). See *Commonwealth* v. *King*, 374 Mass. 5, 13 (1977).

*States* v. *Maude*, 481 F.2d 1062, 1076 (D.C. Cir. 1973). Nor is this a case where what is ordinarily a common word has acquired a judicial gloss. *Commonwealth* v. *Brown*, 10 Mass. App. Ct. 935 (1980). See *Commonwealth* v. *King*, 374 Mass. 5, 13 (1977).

In *Commonwealth* v. *Leroux*, 12 Mass. App. Ct. 886 (1981), we approved the charge substantially in words of the rape statute, and in *Commonwealth* v. *McDonald*, 110 Mass. 405, 406 (1872), the Supreme Judicial Court rejected an instruction specifically on the matter of resistance. It held that resistance was no more than evidence going to the question of force and lack of consent; a ruling that an instruction on resistance was required as a matter of law would have in effect made resistance an element of the crime rather than mere evidence of the crime with reference to which a judge generally need not charge. See *Commonwealth* v. *Goldenberg*, 338 Mass. at 383.

10. The defendant argues in his brief, though no exception was taken at trial, that the jury were misled in their consideration of assault with intent to rape. We have read the entire charge and find nothing to support this contention. The court defined assault with intent to commit rape as "an unlawful attempt, coupled with a present ability and with a specific intent to commit a wrongful act by means of physical force upon another." The offense is defined in greater detail than in *Salemme* v. *Commonwealth*, 370 Mass. 421, 424 (1976), in which the court said: "An assault occurs if there is simply an attempt or threat to do harm." See *United States* v. *Dupree*, 544 F.2d 1050, 1051-1052 (9th Cir. 1976). See also Perkins, Criminal Law 578-579 (2d ed. 1969). Nor do we have any doubt that the jury understood that the specific intent required in this case was an intent to rape.

11. During the jury's deliberations they presented the following question to the court: "On a particular count, if we reach a unanimous vote on the lesser charge, must we reject the major charge by a unanimous vote, also?" After a bench conference in which both counsel participated, an

answer to which they all agreed was formulated; the answer is set out in the margrin.[18]

The jury had been instructed that they must consider the two counts separately. "[B]ut it's your determination how to do it, the mechanics. All I must say, and do instruct, is that you must deal with this count by count . . . ." Thus, within each count the jury had maximum flexibility (and the procedure reflected in the jury's question indicates that they so understood it). The answer given by the court retained such flexibility; we do not read the answer as in any way coercing the jury or creating any risk of a miscarriage of justice. Indeed, appellate counsel suggests no answer that would have been more favorable to the defendant than the answer that was given by the court.

Obviously, there was no harm to the defendant in giving consideration to the greater offense of natural rape for the jury found him not guilty of that charge. Nor was there any substantial risk of a miscarriage of justice in the verdict of guilty of unnatural rape. We see no basis in the evidence for a verdict of guilty of a lesser included offense on that count; indeed the instruction with reference to a lesser included offense on unnatural rape was too favorable to the defendant and was not required if indeed permitted. See *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 320-321 (1973); *Commonwealth* v. *Spear*, 2 Mass. App. Ct. 687, 692-693 (1974). We thus need not enter into the discussion in the various Circuit Courts of Appeals with reference to instructions to the jury as to the order of deliberation in dealing with major offenses and lesser included offenses.

---

[18] The court first instructed the jury that "any decision made by a working jury must be unanimous." (This had been suggested by defense counsel.) The judge then gave the jury two alternatives: "One, if the decision on the lesser offense is not guilty, then you must find not guilty on the major offense . . . . If the decision on the lesser offense is guilty, then you proceed to deliberation on the major offense, until you have reached a unanimous verdict. If you then find not guilty at that point on the major offense, you go back to the lesser offense, on which you have already made a decision of guilt, and you return a verdict of guilty on the lesser offense. The same logic applies to both counts."

See, e.g., *Fullard* v. *United States*, 413 F.2d 369 (D.C. Cir. 1969); *United States* v. *Tsanas*, 572 F.2d 340 (2d Cir.), cert. denied, 435 U.S. 995 (1978); *Catches* v. *United States*, 582 F.2d 453 (8th Cir. 1978); *United States* v. *Hanson*, 618 F.2d 1261 (8th Cir.), cert. denied, 449 U.S. 854 (1980); *Pharr* v. *Israel*, 629 F.2d 1278 (7th Cir. 1980), cert. denied, 449 U.S. 1088 (1981).

*Judgments affirmed.*